UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| HENRY ROHRBACHER, Individually on Behalf of Himself and All Others Similarly Situated, | ) ) ) | Case No. |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| EMDEON INC., GEORGE I. LAZENBY, IV, TRACY L. BAHL, PHILIP U. HAMMARSKJOLD, ALLEN R. THORPE, MARK F. DZIALGA, JONATHAN C. KORNGOLD, JIM D. KEVER, DINYAR S. DEVITRE, BLACKSTONE CAPITAL PARTNERS VI, L.P., HELLMAN & FRIEDMAN LLC, GENERAL ATLANTIC LLC, BEAGLE PARENT CORP., and BEAGLE ACQUISITION CORP., | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

SHAREHOLDER CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY
AND VIOLATIONS OF §14(A) AND §20(A) OF THE SECURITIES EXCHANGE ACT OF
1934 AND RULE 14A-9 OF THE U.S. SECURITIES AND EXCHANGE COMMISSION
PROMULGATED THEREUNDER

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder class action brought by plaintiff on behalf of holders of common stock of Emdeon Inc. ("Emdeon" or the "Company") against Emdeon, the members of Emdeon's Board of Directors (the "Board"), Blackstone Capital Partners VI, L.P. ("Blackstone"), Hellman & Friedman LLC ("Hellman & Friedman"), General Atlantic LLC ("General Atlantic"), Beagle Parent Corp. ("Beagle"), and Beagle Acquisition Corp. ("Merger Sub").   This action arises out of defendants' violations of state law and sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder.   These violations stem from the Board's efforts to sell Emdeon to Blackstone via an unfair process in an all-cash acquisition of the Company at a price of $19.00 per Emdeon share (the "Proposed Acquisition").   As part of their efforts to secure shareholder approval of the Proposed Acquisition, the defendants have filed with the SEC a materially false and misleading Preliminary Proxy on Schedule 14A (the "Proxy").   This action seeks to enjoin defendants from further breaching their fiduciary duties and violating sections 14(a) and 20(a) of the Exchange Act in their pursuit of a sale of the Company at an unfair price through an unfair and self-serving process to Blackstone.

2.      Emdeon provides revenue and payment cycle management and clinical information exchange solutions to clients through its proprietary information exchange system, which is the single largest financial and administrative system of its kind in the United States healthcare system.   The Company's network, developed by Emdeon and its predecessors over 25 years, includes nearly every government and private payer, claim submitting provider, and pharmacy in the United States.   Emdeon processed approximately 5.8 billion transactions in 2010, which accounted for nearly half of the commercial healthcare claims delivered electronically in the United States.   The Company also has a 30 percent market share of Medicare claims processing.

3.      The Company took its current form as a publicly traded entity through an initial public offering (IPO) conducted in August 2009.   In the IPO, defendants Hellman & Friedman and General Atlantic, who prior to the IPO collectively owned 100% of Emdeon through a

holding company called EBS Master LLC ("EBS Master"), sold a minority interest in the Company to public shareholders. Hellman & Friedman and General Atlantic retained a controlling stake in Emdeon following the IPO, and today control an aggregate of approximately 72% of the Company's voting stock. These two firms also retained control of the Board following the IPO through a Stockholders Agreement, which entitles them to nominate a majority of the Company's Board. Now, merely two years after the IPO, Hellman & Friedman and General Atlantic are looking to cash out the interests of Emdeon's public shareholders for their own selfish motives.

4.      The timing could hardly be worse for Emdeon's non-defendant shareholders. The Company is in prime position to capitalize on the evolving healthcare market in the near future. "Health care is going to be going through a lot of changes over the next few years with a lot more people coming into the insured market, and Emdeon is pretty much the connection for the entire system with respect to how providers get paid," according to Richard Close, director of health-care equity research for Avondale Partners LLC. "Emdeon is sitting in a pretty unique position." These changes will accelerate the growth and profitability of what is already a company demonstrating consistently strong financial performance and growth. In each of the past four quarters, Emdeon has recorded year over year gains in revenues and profits, both of which have averaged percentage increases in at least the double digits.

5.      Nonetheless, on August 4, 2011, the Company announced that the Board had entered into the Proposed Acquisition to sell Emdeon to Blackstone for inadequate cash consideration of $19 per Emdeon share. This consideration does not adequately reflect the Company's value, and will unfairly divest Emdeon's public shareholders of their interests in the Company. Though it represents a one-day premium to Emdeon's stock price, the Proposed Consideration is grossly inadequate by numerous measures, including: (i) the Company's target price or valuation set by analysts above the $19 per share consideration; and (ii) premiums in comparable deals that average more than two and a half times the premium presented by the $19 per share consideration.

6.     The Board further breached its fiduciary duties by agreeing to preclusive deal protection devices in connection with the Agreement and Plan of Merger the Company entered into on August 3, 2011 (the "Merger Agreement"). These provisions, which collectively preclude any competing offers for the Company, include: (i) a no-solicitation provision prohibiting the Company from properly shopping itself; (ii) a termination fee payable by the Company to Blackstone for $65 million if Emdeon were to accept a competing bid; and (iii) a five-day matching rights period during which Blackstone can match any superior proposal received by the Company. Worse, the Proposed Acquisition is a *fait accompli* due to Voting Agreements executed by General Atlantic and Hellman & Friedman. The Voting Agreements secure 72 percent of Emdeon's voting shares in favor of the Proposed Acquisition.

7.     Defendants were able to lock up the self-serving Proposed Acquisition through General Atlantic and Hellman & Friedman's control of the Board. Four of the nine current members of the Board are Managing Directors of either General Atlantic or Hellman & Friedman. Two additional members of the Board were installed by General Atlantic and Hellman & Friedman pursuant to the Stockholders Agreement. All nine current Board members were directors when the Company was 100 percent owned by General Atlantic and Hellman & Friedman. Thus, the members of the Board have longstanding ties with and loyalties to General Atlantic and Hellman & Friedman and are not independent. Despite these obvious conflicts, the Board did not create a special committee of truly independent individuals, and instead utilized a farcical grouping of purported outside directors to create the illusion that the Proposed Acquisition received fair, independent consideration.

8.     While Emdeon's public shareholders will be divested of their ownership in the Company for inadequate consideration should the Proposed Acquisition be allowed to proceed, certain of the Individual Defendants will fare much better. For example, defendant George I. Lazenby, IV ("Lazenby"), the Company's Chief Executive Officer ("CEO"), will be allowed to continue his lucrative employment with the Company following the Proposed Acquisition. Further, Lazenby will be entitled to a cash windfall of over $5.1 million in golden parachute payments upon consummation of the Proposed Acquisition.

9.     General Atlantic and Hellman & Friedman will also benefit from the Proposed Acquisition in ways not shared with Emdeon's common shareholders. General Atlantic, which will see a "strong return" on its investment through the Proposed Acquisition, is in line to receive up to $2.75 million in payments from the Company in respect of a Tax Receivable Agreement. Hellman & Friedman, which will benefit from its own Tax Receivable Agreement, is also being permitted to roll over $330 million in equity into the post-Proposed Acquisition company. Thus, Hellman & Friedman will be able to participate in Emdeon's future upside, while the Company's other common shareholders will have no such opportunity.

10.     On August 22, 2011, Emdeon filed with the SEC the Proxy, soliciting the vote of Emdeon shareholders in favor of the Proposed Acquisition. The Proxy contains numerous materially misleading statements or omissions concerning: (i) the process by which the Board determined to sell the Company; and (ii) the financial projections and assumptions underlying the financial advisors' analyses.

11.     Because defendants dominate and control the business and corporate affairs of Emdeon, there exists an imbalance and disparity of economic power between them and the public shareholders of the Company. Therefore, it is inherently unfair for defendants to execute and pursue any proposed acquisition agreement under which they will reap disproportionate benefits to the exclusion of obtaining the maximum shareholder value. Nonetheless, instead of attempting to negotiate a contract reflecting the best consideration available for the Emdeon shareholders who they are duty-bound to serve, the Individual Defendants (as defined herein) disloyally placed their own interests first and tailored the terms and conditions of the Proposed Acquisition to meet their own personal needs and objectives. In short, the Proposed Acquisition is designed to unlawfully divest Emdeon's public shareholders of the Company's valuable assets for grossly inadequate consideration.

12.     To remedy the Individual Defendants' breaches of fiduciary duty and other misconduct, plaintiff seeks, inter alia: (i) injunctive relief preventing consummation of the Proposed Acquisition unless and until the Company adopts and implements a procedure or process to obtain a transaction that provides the best possible terms for shareholders; (ii) a

directive to the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of Emdeon's shareholders; and (iii) rescission of, to the extent already implemented, the Merger Agreement or any of the terms thereof.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all claims asserted herein pursuant to section 27 of the Exchange Act for violations of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331.

14.     Venue is proper in this District because Emdeon has its principle place of business in this District. Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court. Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts within this District.

## PARTIES

15.     Plaintiff Henry Rohrbacher is, and at all times relevant hereto was, a shareholder of Emdeon.

16.     Defendant Emdeon is a Delaware corporation and a leading provider of revenue and payment cycle management and clinical information exchange solutions, connecting payers, providers, and patients in the U.S. healthcare system. Emdeon's comprehensive portfolio of products and services enables its customers to improve efficiency, reduce costs, increase cash flow, and more efficiently manage the complex revenue and payment cycle and clinical information exchange processes. Emdeon's health information network currently reaches approximately 1,200 payers, 500,000 providers, 5,000 hospitals, 81,000 dentists, 60,000 pharmacies, and 150 labs. Emdeon was formed by General Atlantic in September 2006 for the purpose of investing in EBS Master LLC ("EBS Master"), a company formed by HLTH Corporation ("HLTH") to act as a holding company for a group of subsidiaries of HLTH that comprised its Emdeon Business Services segment ("Emdeon Business Services"). In February

2008, affiliates of General Atlantic and Hellman & Friedman purchased the remaining interest in EBS Master from HLTH. Through their ownership in EBS Master, Hellman & Friedman and General Atlantic maintained 100% ownership of Emdeon until the completion of its initial public offering in August 2009. In connection with the initial public offering, Emdeon and the affiliates of General Atlantic and Hellman & Friedman entered into the Stockholders Agreement which entitles the affiliates to nominate a majority of the members of Emdeon's Board. Upon completion of the Proposed Acquisition, Emdeon will become a wholly owned subsidiary of Beagle. Emdeon's principal executive offices are located at 3055 Lebanon Pike, Suite 1000, Nashville, Tennessee.

17.     Defendant Lazenby is Emdeon's CEO and a director and has been since September 2008. Lazenby is also CEO and a director of EBS Master and has been since March 2007. Lazenby was Executive Vice President – Provider Services of Emdeon Business Services from December 2003 to March 2007. Upon completion of the Proposed Acquisition, Lazenby is expected to remain an executive of the surviving corporation.

18.     Defendant Tracy L. Bahl ("Bahl") is Emdeon's Executive Chairman of the Board and has been since May 2009 and Chairman of the Board of EBS Master and has been since February 2008. Bahl was also Emdeon's Non-Executive Chairman of the Board from September 2008 to May 2009. Bahl was nominated by General Atlantic to serve on Emdeon's Board pursuant to the Stockholder Agreement.

19.     Defendant Philip U. Hammarskjold ("Hammarskjold") is an Emdeon director and has been since September 2008 and a director of EBS Master and has been since February 2008. Hammarskjold is also Chief Executive Officer of Hellman & Friedman and has been since 2009. Hammarskjold joined Hellman & Friedman in 1992 and has served as a Partner or Managing Director of Hellman & Friedman since January 1996. Hammarskjold was nominated by Hellman & Friedman to serve on Emdeon's Board pursuant to the Stockholder Agreement.

20.     Defendant Allen R. Thorpe ("Thorpe") is an Emdeon director and has been since September 2008 and a director of EBS Master and has been since February 2008. Thorpe is also a Managing Director of Hellman & Friedman and has been since 2004. Thorpe joined Hellman

& Friedman in 1999.  Thorpe was nominated by Hellman & Friedman to serve on Emdeon's Board pursuant to the Stockholder Agreement.

21.  Defendant Mark F. Dzialga ("Dzialga") is an Emdeon director and has been since September 2008 and a director of EBS Master and has been since November 2006.  Dzialga is also a Managing Director of General Atlantic and has been since 1998.  Dzialga was nominated by General Atlantic to serve on Emdeon's Board pursuant to the Stockholder Agreement.

22.  Defendant Jonathan C. Korngold ("Korngold") is an Emdeon director and has been since September 2008 and a director of EBS Master and has been since November 2006.  Korngold is also a Managing Director of General Atlantic and has been since 2006.  Korngold joined General Atlantic in 2001.  Korngold was nominated by General Atlantic to serve on Emdeon's Board pursuant to the Stockholder Agreement.

23.  Defendant Jim D. Kever ("Kever") is an Emdeon director and has been since September 2008 and a director of EBS Master and has been since November 2006.  Kever was jointly nominated by Hellman & Friedman and General Atlantic to serve on Emdeon's Board pursuant to the Stockholder Agreement.

24.  Defendant Dinyar S. Devitre ("Devitre") is an Emdeon director and a director of EBS Master and has been since September 2008.

25.  Defendant Blackstone is a Delaware limited partnership and an affiliate of Blackstone Group, L.P., one of the world's leading investment and advisory firms.  Blackstone is primarily engaged in investing in securities and committing capital to facilitate corporate restructurings, leveraged buyouts, bridge financings, and other investments.  Upon completion of the Proposed Acquisition, Blackstone is expected to own approximately 72.5% of Beagle.  Blackstone's principal executive offices are located at 345 Park Avenue, New York, New York.

26.  Defendant Hellman & Friedman is a Delaware limited liability company and a leading private equity investment firm with offices in San Francisco, New York, and London.  Hellman & Friedman is focused on investing in superior business franchises and serving as a value-added partner to management in select industries, including internet and digital media, software, business and marketing services, financial services, insurance, media, healthcare, and

energy and industrials. Since its founding in 1984, Hellman & Friedman has raised and, through its affiliated funds, managed over $25 billion of committed capital. As of August 16, 2011, Hellman & Friedman owned 11,679,697 shares of Emdeon's Class A common stock (including 40,000 vested options) and 22,586,390 shares of Class B common stock (able to be exchanged for Class A common stock at any time on a one-for-one basis), for a combined voting power of 29.6%. Upon completion of the Proposed Acquisition, the affiliates of Hellman & Friedman are expected to own approximately 27.5% of Beagle. Hellman & Friedman's principal executive offices are located at One Maritime Plaza, 12th Floor, San Francisco, California.

27.     Defendant General Atlantic is a Delaware limited liability company and leading global growth equity firm that provides capital and strategic support for growth companies. Founded in 1980, General Atlantic manages approximately $17 billion in capital and has more than 75 investment professionals based in Greenwich, New York, Palo Alto, São Paulo, London, Düsseldorf, Hong Kong, Beijing, and Mumbai. As of August 16, 2011, General Atlantic owned 49,121,313 shares of Emdeon's Class A common stock, representing a total voting power of 42.4%. General Atlantic's principal executive offices are located at Three Pickwick Plaza, Greenwich, Connecticut.

28.     Defendant Beagle is a Delaware corporation and an affiliate of the Blackstone Group, L.P. and Blackstone. Beagle was formed in connection with the financing of the Proposed Acquisition.

29.     Defendant Merger Sub is a Delaware corporation and a wholly owned subsidiary of Beagle. Upon completion of the Proposed Acquisition, Merger Sub will merge with and into Emdeon and will cease its separate existence.

30.     The defendants named above in ¶¶17-24 are sometimes collectively referred to herein as the "Individual Defendants."

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

31.     Under Delaware law, the officers and directors of a publicly traded corporation have fiduciary duties of loyalty, good faith, and care to shareholders. To diligently comply with these duties, neither the officers nor the directors may take any action that:

(a)    adversely affects the value provided to the corporation's shareholders;

(b)    will discourage, inhibit, or deter alternative offers to purchase control of the corporation or its assets;

(c)    contractually prohibits themselves from complying with their fiduciary duties;

(d)    will otherwise adversely affect their duty to secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)    will provide the officers and/or directors with preferential treatment at the expense of, or separate from, the public shareholders.

32.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as officers and/or directors of Emdeon, are obligated under Delaware law to refrain from:

(a)    participating in any transaction where the officers' or directors' loyalties are divided;

(b)    participating in any transaction where the officers or directors receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)    unjustly enriching themselves at the expense or to the detriment of the public shareholders.

33.    The Individual Defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties and/or aiding and abetting such breaches, including the Individual Defendants' duties of loyalty, good faith, and independence owed to plaintiff and other public shareholders of Emdeon. Certain of the Individual Defendants stand on both sides of the transaction, are engaging in self-dealing, and are obtaining for themselves personal benefits, including personal financial benefits not shared equally by plaintiff or the Class (as defined herein). Certain Emdeon officers and directors are also retaining their prestigious and lucrative positions and compensation post-acquisition. These officers and directors have managed to secure for themselves substantial employment and/or

directorships at the expense of the shareholders' best interests. Accordingly, the Proposed Acquisition will benefit the Individual Defendants in significant ways not shared with Class members. As a result of the Individual Defendants' self-dealing and divided loyalties, neither plaintiff nor the Class will receive adequate or fair value for their Emdeon common stock in the Proposed Acquisition.

34.     Because the Individual Defendants are knowingly or recklessly breaching their duties of loyalty, good faith, and independence in connection with the Proposed Acquisition, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price, and terms, is placed upon defendants as a matter of law.

## BACKGROUND TO THE PROPOSED ACQUISITION

35.     Emdeon became a publicly traded entity through an IPO conducted in August 2009. To celebrate the IPO and the Company's listing on the NYSE, defendant Lazenby rang the NYSE Opening Bell on August 25, 2010. If the Defendants have their way, Emdeon's time as a publicly traded company will be very short.

36.     Less than a year after going public, the Individual Defendants were already considering selling the Company. In April 2010, the Company met with Party A, a public company in the information technology industry, to discuss possibilities for strategic cooperation between the two companies. The Proxy does not disclose, however, whether it was Emdeon that first contacted Party A or whether Party A was the one who initiated the contact. The Proxy also does not indicate whether the Board was ever made aware of the discussions with Party A.

37.     Talks with Party A came to a halt in May 2010. Shortly thereafter, Emdeon's senior management met on August 17, 2010 with representatives of Party B, a public company in the healthcare industry. During the meeting, representatives of Party B indicated to the Company's senior management that Party B was interested in beginning discussions regarding a potential strategic acquisition of the Company by Party B. Despite the fact that antitrust concerns purportedly came to dominate the dialogue between Emdeon and Party B, the Proxy does not disclose whether antitrust concerns were discussed at all during this initial meeting.

38.     On January 5, 2011, the Company began discussions with Party C, a public company in the information technology industry, about possibilities for strategic cooperation between the two companies. During these discussions, Party C indicated that it might be interested in pursuing a strategic acquisition of the Company. The Company and Party C subsequently entered into a confidentiality agreement and spoke intermittently during the next several months about the merits of a potential transaction.

39.     The Company entered into a confidentiality agreement with Party B on January 10, 2011, before the Board even formally knew that these discussions were occurring.    In addition, the Company met with representatives of Party B to discuss further the merits of a potential transaction. Following the meeting, Party B requested and received certain due diligence information from the Company.

40.     The Board was not informed of these developments until early March 2011 – seven months *after* the initial meeting with Party B.    However, the Proxy does not disclose whether the Board was also informed of Party C's interest, or the fact that the Company and Party C had entered into a confidentiality agreement two months ago.    At the meeting, the Board decided to retain outside advisors in connection with its exploration of the strategic alternatives for the Company, and engaged Morgan Stanley to serve as its financial advisor.  Morgan Stanley previously served as one of the Company's book-running managers for the IPO. The Proxy does not disclose whether any other potential financial advisors were considered.

41.     On March 7, 2011, Morgan Stanley contacted Party D, a public company in the healthcare industry, regarding a potential strategic acquisition of the Company by Party D.  Over the course of the next several months, the Company and Party D discussed potentially holding a meeting to explore the merits of a strategic transaction.

42.     On March 22, 2011, Party B called the Company to indicate that it would be willing to pay $18.50 to $18.75 per share in cash and shares of Party B's common stock to acquire the Company.   During the call, Party B also proposed a timeline for the potential transaction and asked the Company to enter into an exclusivity agreement with Party B.  After the call, Lazenby held a conference call with the Board to discuss Party B's proposal.  The Board

directed management to continue talking with Party B, but to inform Party B that its offer was too low. The Board also instructed the Company's senior management to obtain advice from Hogan Lovells, the Company's antitrust counsel, regarding potential antitrust issues relating to a potential transaction with Party B. Despite having been in discussions with Party B for over seven months, including giving Party B due diligence information, this was the first time that antitrust concerns were raised.

43.     On April 1, 2011, Party B contacted the Company and increased its offer for the Company to $19.25 per share, payable in cash and shares of Party B's common stock.

44.     On April 7, 2011, the Board met to discuss Party B's most recent proposal. The Board also reviewed with Morgan Stanley potential strategic and financial acquirers that might have interest in an acquisition of the Company. The Board then discussed with Morgan Stanley the likelihood that potential strategic acquirers – like Party B – would be able to pay greater premiums to acquire the Company than potential financial acquirers. The Proxy, however, does not disclose how either the Board or Morgan Stanley arrived at this conclusion. Further, the Proxy does not disclose if there was any discussion of antitrust concerns that strategic parties might present. The Board then instructed the Company's senior management and Morgan Stanley to continue discussions with Party B and its financial advisor, but to inform Party B that the terms of its revised proposal, particularly relating to process and timing, were still not acceptable.

45.     On April 19, 2011, a senior executive of Party C called Lazenby and informed him that Party C was unable to pursue an acquisition of the Company due to recent changes in the leadership of Party C and reluctance to making an acquisition of the Company's size.

46.     On April 20, 2011, the Company was contacted by, and began discussions with, Party E, a public company in the health insurance industry. On April 22, 2011, the Company's senior management met with representatives of Party E and discussed the Company and its business. Subsequently, in May 2011, Party E informed the Company that it could not commit to making an acquisition of the Company.

47.     On May 17, 2011, Party B informed the Company that it was willing to increase its offer for the Company again, this time to $19.50 per share in cash and shares of Party B's common stock to acquire the Company (with the cash component to comprise not less than 60% of the consideration). Based on Emdeon's closing price on that day, Party B's offer represented a **_premium of 24.8%_**. Party B also requested an exclusivity period of up to 45 days to complete due diligence and negotiate and prepare a definitive agreement for the potential transaction.

48.     Notwithstanding the substantial premium available through Party B's offer, at a May 26, 2011 Board meeting, the Board dwelled on the disadvantages of Party B's May 17, 2011 proposal, including, but not limited to: (i) the fact that the proposed consideration consisted of a mix of cash and shares of Party B's common stock; and (ii) antitrust regulatory risks with respect to the combination of the Company's and Party B's respective businesses. The Board instructed the Company's senior management to make a counterproposal to Party B with the following terms: (i) a $20.00 per share purchase price consisting of cash and shares of Party B's common stock, with at least $16.00 per share (*i.e.* 80% of such purchase price) payable in cash, with a "collar"; (ii) an agreement by Party B to (a) divest certain assets and/or accept certain regulatory remedies, if necessary, to obtain antitrust clearance for the proposed acquisition, and (b) pay a "ticking fee" with respect to the $20.00 per share purchase price to compensate the Company's stockholders for the lost time value of money that would be occasioned if there were to be significant delay in obtaining such antitrust clearance; and (iii) a significant reverse termination fee, which would be payable by Party B to the Company in the event that the acquisition of the Company was not consummated due to a failure to obtain antitrust clearance. Despite the numerous terms in its counterproposal, the Board also concluded that the Company would not agree to exclusivity with Party B.

49.     On June 4, 2011, a senior executive of Party B informed Lazenby that the terms of the Company's counterproposal, including those relating to antitrust risk allocation, were unacceptable to Party B. The senior executive of Party B insisted that if Party B were to pursue an acquisition of the Company the antitrust risks relating to such transaction would need to be "shared" by both the Company and Party B.

50.     On June 9, 2011, the Board participated in a conference call with Company management and the Company's advisors. The group discussed Party B's proposal, focusing on antitrust issues, specifically the amount of time – 9 to 12 months – that antitrust review could take. Given the quickness within which the Individual Defendants opted to sell the Company, so soon after taking it public, such a long timeframe was undoubtedly concerning.

51.     Party B made a concession to the Board in its revised proposal submitted on June 15, 2011. Specifically, Party B agreed to divest, if necessary, assets having a value no greater than a specified dollar amount to obtain antitrust clearance. In return, Party B again asked for a 45-day exclusivity period and a marketing period (which would begin after all of the conditions to the transaction had been satisfied) for its debt financing.

52.     Despite Party B's significant concession regarding the allocation of antitrust risk, the Board still was not satisfied. At a June 15, 2011 conference, the Board again expressed concern about the 9 to 12 month antitrust clearance process. The Board also noted, this time on a conference call two days later, that Party B still had not yet proposed an acceptable comprise for antitrust risk allocation. The Proxy fails to disclose, however, the kind of risk allocation the Board sought.

53.     On June 21, 2011, the Company and Party D entered into a confidentiality agreement.

54.     Also, on June 21, 2011, a senior executive of Party B contacted Lazenby with Party B's final proposal to acquire the Company. Party B stated that it was willing to accept certain obligations to divest assets to obtain antitrust clearance for the transaction.

55.     Unwilling to meet Party B halfway on the antitrust issues, the Individual Defendants sought out a suitor that would present no antitrust hurdles so as to ensure that a deal could be done swiftly. They found such a suitor in Blackstone. On June 21, 2011, representatives of Blackstone contacted Thorpe about Blackstone's potential interest in acquiring the Company. Representatives of Blackstone stated that it was willing to make an offer to acquire the Company at $19.00 per share in cash – $0.50 per share less than what Party B was

offering in its revised proposal, and with no upside potential, as with Party B's part stock proposal.

56. On June 22, 2011, the Board convened a meeting with the Company's senior management and advisors to discuss the latest developments with respect to Party B, Party D, and Blackstone. Despite the fact that a mere two months earlier the Board had deemed financial acquirers unable to pay premiums as large as their strategic counterparts, a fact that was confirmed by Blackstone's indicative purchase price vis-à-vis Party B's, the Board was nonetheless attracted to Blackstone due to the absence of any significant antitrust concerns and the likelihood that a transaction with Blackstone could be consummated quickly.

57. Also, on June 22, 2011, the Company negotiated and entered into a confidentiality agreement with Blackstone.

58. On June 29, 2011, Blackstone told representatives of the Company that it was willing to consider increasing its purchase price to a range of $19.00 to $19.50 per share. While Blackstone was merely considering increasing its purchase price, Party B held steady with its $19.50 per share offer. More importantly, as least for the Individual Defendants, Blackstone indicated that it would be in a position to sign a definitive agreement to acquire the Company within approximately three weeks.

59. In early July 2011, the Company engaged UBS as co-financial advisor to the Company, along with Morgan Stanley. Like Morgan Stanley, UBS served as one of Emdeon's book-running managers in the IPO. The Proxy, however, does not disclose what prompted the hiring of a second financial advisor so late in the sale process.

60. During this time, the Company continued to negotiate with Party B but, given that it had found itself an ideal suitor in Blackstone, was unwilling to make any concessions. Instead, it demanded more concessions from Party B regarding antitrust risk allocation. Faced with a partner unwilling to negotiate, on July 19, 2011, Party B informed Lazenby that it would cease pursuing an acquisition of the Company. At this time, Party B still possessed the highest offer per share for the Company.

61.     In mid-July 2011, with Party B out of the way, the Company focused its attention on Blackstone. Blackstone, however, suddenly changed its mind and refused to increase its offer to $19.50 per share. Instead, it claimed it was committed to pay $19.00 per share. The Board fully supported this per share amount, despite there being a higher offer for the Company.

62.     On July 27, 2011, despite the confidentiality agreement entered into between Emdeon and Blackstone, *The Wall Street Journal* published a story that Blackstone was in advanced negotiations to acquire the Company. Following such publication, one of the Company's directors was contacted by a representative of Party F, a private equity firm, to inquire about the Company's sale process. The Proxy does not disclose how *The Wall Street Journal* obtained this information.

63.     After Party D withdrew from the process on July 29, 2011, the Company and Blackstone spent the next week negotiating provisions to the merger agreement. On August 3, 2011, the Board met with the Company's senior management, Morgan Stanley, UBS, and the Company's legal advisors to discuss a potential transaction with Blackstone. At the meeting, Morgan Stanley and UBS delivered their respective fairness opinions regarding the Proposed Acquisition to the Board. The Board then approved the Proposed Acquisition and the Merger Agreement.

## THE PROPOSED ACQUISITION

64.     On August 4, 2011, Emdeon issued the following press release announcing that the Individual Defendants had agreed to sell Emdeon to Blackstone in an all-cash transaction worth $19 per share. The press release stated:

> Emdeon Inc. (NYSE: EM), a leading provider of healthcare revenue and payment cycle management and clinical information exchange solutions, today announced that it has entered into a definitive merger agreement with Blackstone Capital Partners VI L.P. under which this Blackstone fund will acquire a controlling interest in Emdeon in a transaction valued at approximately $3 billion that will result in Emdeon becoming a private company. Hellman & Friedman will maintain a significant minority equity interest in Emdeon.

> Under the terms of the merger agreement, holders of Emdeon common stock will receive $19.00 per share in cash. Emdeon's Board of Directors has unanimously approved the merger agreement and is recommending that Emdeon's stockholders

adopt the merger agreement. General Atlantic and Hellman & Friedman have agreed to vote shares owned by them representing, in the aggregate, approximately 70% of the Company's outstanding shares, in favor of the transaction.

"This transaction provides for a great return for our investors," said George Lazenby, chief executive officer for Emdeon. "We are excited about the opportunity to move forward with two excellent investors in Blackstone and Hellman & Friedman. They each have an in-depth understanding of our business and industry, and will be tremendous partners as we continue to pursue our strategy of making healthcare efficient. We are looking forward to building upon our leadership position in healthcare information technology and services, made possible by the continued support of our customers and the dedication and commitment of our employees."

Lazenby continued, "We also wish to acknowledge the tremendous contributions of global growth investor General Atlantic in our development and thank them for the leadership and support they have provided since becoming our majority owner in 2006."

"We are thrilled to be investing in such a high quality company," said Neil P. Simpkins, senior managing director of Blackstone. "Blackstone looks forward to supporting Emdeon and its experienced management team, in continuing to provide innovative products and services to the healthcare industry."

"We are excited about the proposed transaction and the value it brings to Emdeon stockholders," said Allen Thorpe, managing director for Hellman & Friedman. "We believe that Emdeon has a great healthcare IT franchise and we look forward to the next chapter of our working relationship."

The transaction is subject to customary closing conditions, including approval by Emdeon's stockholders and clearance under the Hart-Scott-Rodino Act, and is currently expected to be completed in the second half of 2011. Following completion of the transaction, Emdeon will become a privately held company and its Class A common stock will no longer be traded on the New York Stock Exchange.

Morgan Stanley acted as lead financial advisor and UBS Investment Bank acted as co-financial advisor to Emdeon's Board of Directors. Paul Weiss, Rifkind, Wharton & Garrison LLP acted as legal advisor to Emdeon. King & Spalding LLP acted as legal advisor to Emdeon's outside directors. Blackstone Advisory Partners LP, Banc of America Merrill Lynch, Barclays Capital and Citigroup acted as financial advisors and Ropes & Gray LLP acted as legal advisors to Blackstone.

65. On August 8, 2011, the Company filed a Form 8-K with the SEC wherein it disclosed the Merger Agreement. The announcement and filing reveal that the Proposed Acquisition is the product of a flawed sales process and, unless the offer price is increased, would be consummated at an unfair price.

66. Under Section 5.4 of the Merger Agreement, Emdeon is subject to a no-solicitation clause that prohibits the Company from seeking a superior offer for its shareholders. Section 5.4(a) states that:

> From and after the date hereof until the earlier of the Effective Time or the termination of this Agreement pursuant to Article VII hereof, and except as expressly permitted by Section 5.4(b), the Company shall not, and the Company shall cause its Subsidiaries and direct its Representatives not to, directly or indirectly, (i) solicit, initiate, knowingly facilitate or knowingly take any action designed to encourage or facilitate any inquiries regarding, or the making of any proposal or offer that constitutes, or may reasonably be expected to constitute, a Takeover Proposal, (ii) enter into or participate in any discussions with, or furnish any non-public information relating to the Company or any of its Subsidiaries to, or afford access to the property, books or records of the Company or its Subsidiaries to, any Person that, to the Knowledge of the Company, is seeking to make, or has made, a Takeover Proposal (other than to state that the Company is not permitted to have discussions), or (iii) terminate, amend, release, modify or fail to enforce any provision of, or grant any permission, waiver or request under, any standstill, confidentiality or similar agreement entered into by the Company in respect of or in contemplation of any Takeover Proposal, or publicly propose to do any of the foregoing; provided, that notwithstanding anything in this Agreement to the contrary, the Company shall be permitted to take any of the actions described in the foregoing clause (iii) if the Company Board determines in good faith, after consultation with outside legal counsel, that a failure to cause the Company to take any such action would reasonably be expected to be inconsistent with the fiduciary duties of the Company Board, to the extent required in order for such applicable Person to make a Takeover Proposal.

67. Though the Merger Agreement ostensibly has a purported "fiduciary out" provision that allows the Company to negotiate with other bidders, this provision is actually illusory. In order for Emdeon to negotiate with any other suitors, the potential acquirer would first have to make an unsolicited superior offer. Without access to non-public information, which the Company is prevented from offering under the Merger Agreement prior to the receipt

of an offer that the Company reasonably expects to lead to a superior deal, no other bidder will emerge to make such an offer.

68. The likelihood of another offer is further reduced by the "matching rights" clause found in Section 5.4(e)(iii) of the Merger Agreement. This provision affords Blackstone five days to consider and match the terms of any proposal superior to its own, and serves to dissuade any competing bidders from emerging. Under Section 5.4(e)(iii), Emdeon may accept a competing "Superior Proposal" only if:

> Parent does not make, within five calendar days after a Notice of Superior Proposal is delivered to Parent (it being understood and agreed that any material change to the financial or other terms and conditions of such Superior Proposal shall require an additional notice to Parent and an additional two calendar day period), a binding and irrevocable written and complete proposal (including any schedules or exhibits) that the Company Board determines in good faith, after consultation with the Company's outside legal counsel and financial advisors, causes the Superior Proposal described in such Notice of Superior Proposal to no longer constitute a Superior Proposal; provided, that during such five calendar day period after a Notice of Superior Proposal is provided to Parent (or such two calendar day period after an additional notice of any material change to the financial or other terms and conditions of a Superior Proposal is provided to Parent), the Company shall, and shall direct its financial and legal advisors, to negotiate with Parent and Merger Sub in good faith (to the extent Parent and Merger Sub desire to negotiate) to make such adjustments in the terms and conditions of this Agreement so that the Superior Proposal described in such Notice of Superior Proposal ceases to constitute a Superior Proposal.

69. Emdeon is also subject to another preclusive lock-up provision in Section 7.6 of the Merger Agreement. Section 7.6 states that Emdeon must pay to Blackstone a termination fee of $65 million if it accepts a superior proposal. This provision is unfair to the Company's shareholders and contrary to their interests because it deters and prevents the submission of higher proposals, especially in connection with the no-solicitation and matching rights clauses in Section 5.4. Indeed, the $65 million termination fee would add an additional $0.71 per share to the cost of a competing bid to acquire the Company.

70. Worst of all, consummation of the Proposed Acquisition is already a foregone conclusion due to the Voting Agreements executed by Hellman & Friedman and General Atlantic. Because Hellman & Friedman and General Atlantic collectively control approximately

72 percent of Emdeon's common stock, the votes of the Company's remaining public shareholders are rendered meaningless and the Proposed Acquisition is a *fait accompli*. Indeed, defendants disclose in the Proxy:

> Certain stockholders of the Company affiliated with General Atlantic LLC (the "GA Equityholders") and certain stockholders of the Company affiliated with Hellman & Friedman LLC, including H&F Harrington (collectively, the "H&F Equityholders"), have entered into separate voting agreements with Parent that cover an aggregate of approximately 72.0% of the outstanding shares of Emdeon common stock, pursuant to which, unless the applicable voting agreement is terminated in accordance with its terms (including upon a termination of the merger agreement in accordance with its terms), such stockholders have agreed to, among other things, vote, or cause to be voted, their shares of Emdeon common stock in favor of the adoption of the merger agreement and approval of any related proposal in furtherance of the merger and the transactions contemplated by the merger agreement. Accordingly, ***adoption of the merger agreement and approval of any related proposal in furtherance of the merger and the transactions contemplated by the merger agreement will not require the affirmative vote of any stockholder other than the GA Equityholders and the H&F Equityholders.*** However, your vote is very important, and we encourage you to vote your shares of Emdeon common stock.

71.    The provisions above, which will serve to unreasonably deter and discourage superior offers from other interested parties, were agreed to by the Individual Defendants to help secure the personal benefits and unfair profits afforded to them through the Proposed Acquisition and all but ensure that no other bidder steps forward to submit a superior proposal. These provisions effectively guarantee that the Proposed Acquisition will be consummated, despite the unfair process undertaken by defendants and the unfair consideration, without affording Emdeon's remaining public shareholders so much as a meaningful vote on its completion.

## THE PROPOSED ACQUISITION UNDERVALUES EMDEON

72.    The Proposed Acquisition significantly undervalues the Company and its future prospects. Emdeon has demonstrated and has in fact projected that it is well-positioned for growth due to its well-developed customer network, its valuable, innovative, and ubiquitous

product, and anticipated changes in the healthcare and government climates and levels of Medicare and Medicaid reimbursements.

73. Over the past 25 years, the Company and its predecessors have developed an impressive network of payers and providers that, according to Emdeon, now includes "virtually all private and government payers, claim submitting providers and pharmacies." This strong customer base enabled Emdeon to process 5.8 billion transactions in 2010, including about half of the commercial healthcare claims delivered electronically in the United States. Indeed, the Company's health information network, described by analyst Ryan Daniels at William Blair as "an important asset in the HCIT [(Healthcare Information Technology)] space with significant cash-generating characteristics," is the single largest financial and administrative information exchange in the United States healthcare system.

74. Emdeon's core network provides a complete range of business and administrative functions for its customers from prior to the patient encounter through claims management, patient billing, and payment processing. According to Leo Carpio ("Carpio"), an analyst at Caris & Company, Emdeon's "colossal claims database, sizeable customer base and breadth of capabilities could provide the evidence based medical knowledge repository that payers desired." Through the use of the Company's products, Emdeon's customers are able to improve their efficiency in managing clinical information exchange processes and the complex revenue and payment cycle.

75. This improved efficiency allows Emdeon's customers to reduce costs and increase cash flow through use of the Company's ubiquitous revenue and payment cycle network and solutions. As a result, given the climate in the United States government and economy and the resultant need to slow the rise in healthcare expenditures, adoption of the Company's solutions is only expected to accelerate. Carpio explains in a Reuter's article, "while the fiscal deficit would result in Medicare and Medicaid reimbursement cuts, hospitals and healthcare providers will seek healthcare IT providers to cut costs." Emdeon owns 30 percent of the Medicare claims processing market, giving the Company a valuable angle towards continuing the growth in its customers and business.

76.     Other recent industry trends also favor adoption of electronic transactions and Emdeon's healthcare information systems, which should continue the Company's impressive growth. For example, Congress passed legislation in 2008 providing financial incentives to Medicare providers that use electronic prescribing. More recently, the American Recovery and Reinvestment Act of 2009 included at least $20 billion in federal subsidies to incentivize the implementation and meaningful use of electronic health records. Also, the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, requires the adoption of additional standardized electronic transactions and contains provisions intended to further link Medicare and Medicaid program payments to quality and efficiency. As Emdeon stated in its 2010 Form 10-K:

> We believe the increased need to slow the rise in healthcare expenditures, particularly during the recent period of U.S. economic weakness, increased financial pressures on payers and providers and public policy initiatives to reduce healthcare administrative inefficiencies **should accelerate adoption of our solutions.**

77.     Although the prevailing directive is to slow healthcare expenditure growth, healthcare costs are a significant component of the United States economy and are expected to continue growing. In 2009, these expenditures amounted to $2.5 trillion, or 17% of the United States gross domestic product. Through 2018, healthcare expenditures are expected to grow 6.1% annually to $4.4 trillion, 20% of the United States gross domestic product. The strong future prospects for Emdeon in this healthcare environment and the motivation to take the Company private now while its stock is undervalued were expressed in an August 5, 2011 article in *The Tennessean*:

> "*The long-term demand for health-care services is very strong and carries good cash flow*," said Frank Morgan, a stock analyst for RBC Capital Markets in Nashville. "There are good, long-term growth opportunities with the expansion of health-care coverage coming in 2014. It's attractive because it's pretty stable cash flow that can be used to provide financing for expansions."

*Emdeon's under-valued stock could be the main reason for taking the company private again*, analysts said, a move that will allow the company to grow without the intense daily scrutiny of its stock price by Wall Street.

78.     Further, the cost of healthcare administration represents a significant portion of total healthcare expenditures, and Emdeon's valuable market position in this space has and will enable the Company to continue its revenue and profit growth well into the future.  According to Morgan Keegan healthcare analyst Jamie Stockton, as quoted in *The Tennessean*:

> "*We've been recommending that people buy Emdeon*," Stockton said. "*The reason is that it was a very inexpensive way to get exposure to health-care information technology.* Half of Emdeon's business already is electronic, delivering an insurance claim from your doctor to your insurance company."
>
> The other half of the business is now paper-based, with Emdeon printing and mailing checks to providers and sending explanations of benefits to patients.
>
> But those functions will go electronic as time goes by under terms of the health-care reform act, *giving Emdeon significant growth in profits per transaction*, Stockton said.
>
> "*There is a very significant margin expansion opportunity for Emdeon*," Stockton said, adding that the company "also is working to sell other software and services to providers."

79.     Emdeon is well-positioned to reap the benefits of these growth prospects, and indeed its recent financial results show that it has already begun doing so.  Over each of the past four fiscal quarters, the Company has registered year-over-year increases in revenue and net income.  As such, the Company is rapidly growing its business, with average year over year revenue growth of 12.6 percent per quarter, and doing so in such a way that its profitability is maintained.  The following table demonstrates the sustained growth in these financial results:

|  | 3Q10 | 4Q10 | 1Q11 | 2Q11 |
|---|---|---|---|---|
| Revenue (millions) | $245.92 | $275.66 | $271.50 | $282.11 |
|  |  |  |  |  |
| YOY Increase | 4.44% | 15.55% | 14.42% | 15.96% |
|  |  |  |  |  |
| Net Income (millions) | $6.63 | $15.02 | $7.28 | $9.23 |
|  |  |  |  |  |
| YOY Increase | n/a | 220.09% | 70.65% | 27.20% |

80.     These stellar and continually improving financial results, as well as the Company's strong growth prospects, were well-described by defendant Bahl during Emdeon's May 5, 2011 earnings conference call for the first quarter of fiscal 2011, on which he stated:

> *We are very pleased with the first-quarter results and believe these results represent solid performance across all aspects of our business.* During the first quarter, we delivered total revenues of $271.5 million, adjusted EBITDA of $68.8 million, and adjusted net income per fully diluted share of $0.23. *We're off to a great start in 2011, meeting or exceeding internal plans on all fronts* and consistent with our expectations underlying our full-year guidance.
>
> *  *  *
>
> *In our core businesses, our transaction volume continues to grow at a consistent pace* as we add differentiated and value-added transactional capabilities for our customers. Over the past year alone, we began supporting electronic claims attachments, interactive tier management solutions and several new types of pharmacy transactions. These innovative transactions leverage the connectivity we have built over the past 25 years to provide value to our customers and provide additional transactions for each encounter.
>
> *We are also encouraged by the continued momentum in our emerging businesses*, including seven-figure deals signed during the first quarter in both payment integrity and payment automation as well as early success in our clinical information exchange offers.
>
> *  *  *
>
> Now we had an opportunity to share a lot of information about our growth strategy at our recent Investor Summit, and, as we outlined that day, we are very excited about the opportunities that lie ahead of us. *We firmly believe that by leveraging our connectivity, our position in the workflow, our access to data, and our comprehensive solution set will drive meaningful growth for this business going forward.* These strengths give Emdeon a distinct advantage in the revenue and payment cycle space, as well as the emerging area of clinical information exchange. We hope that those of you that participated came away from the Investor Summit with a better understanding of the value that we offer our customers across the entire health care delivery spectrum.

81.     On August 8, 2011, Emdeon followed up its impressive first quarter financial results by reporting similarly strong results for the second quarter of fiscal 2011. In the second quarter, the Company reported net income of $9.2 million and revenue of $282.1 million,

representing robust year over year growth of 27.20 percent and 15.96 percent, respectively. Defendant Lazenby echoed this sentiment, stating:

> We are pleased with our financial results for the second quarter. Our new initiatives in clinical information exchange and recently acquired solutions are resonating with our customer base. Emdeon's revenue cycle management and payment distribution solutions also continued to contribute solid organic growth.

82.     These healthy and growing financial results for Emdeon led analysts to develop robust expectations for the Company's future financial and stock price performance. Prior to the announcement of the Proposed Acquisition, numerous analysts had target prices or valuations for Emdeon stock in excess of the inadequate $19 per share consideration. For example:

(a)     Jamie Stockton of Morgan Keegan had a target price of $21 per Emdeon share;

(b)     James Kumpel of Madison Williams had a price target of $21 per Emdeon share;

(c)     Carpio of Caris & Company had a price target of $20 per Emdeon share; and

(d)     Larry Marsh of Barclays Capital had a price target of $20 per Emdeon share.

83.     Further, the Proposed Acquisition undervalues the Company by another common measure. Defendants have stated that the $19 per share consideration provides a 16.9 percent premium to Emdeon's closing price on the trading day prior to the August 4, 2011 announcement. While true, defendants ignore the fact that this premium pales in comparison to recent comparable deals in the chemicals sector. According to data from *Bloomberg*, the premium in announced or completed acquisitions of medical software companies over the past five years was typically 45 percent, more than two and a half times the premium afforded Company shareholders in the Proposed Acquisition.

84.     The $19 per share consideration does not reflect the true inherent value of the Company at the time the Proposed Acquisition was announced. By agreeing to the Proposed Acquisition, defendants have brought the Company's public shareholders' benefits and share in

Emdeon's future growth to an abrupt end. In contravention of applicable law, the $19 per share consideration, which will extinguish shareholders' interests in the Company, is grossly inadequate and does not represent the maximum value reasonably available.

## VIOLATIONS OF THE DUTY TO DISCLOSE

85. In order to secure shareholder approval of this unfair deal, defendants filed the materially misleading Proxy on August 22, 2011. The Proxy purports to set forth the reasons why the Board is recommending that Emdeon shareholders vote to approve the transaction. However, the Proxy omits and/or misrepresents material information about, among other things: (i) the unfair sales process by which the Board determined to sell the Company; (ii) the financial projections and assumptions underlying the fairness opinions provided by Emdeon's financial advisors, Morgan Stanley and UBS; and (iii) the services rendered by these financial advisors. Specifically, the Proxy omits and/or misrepresents the material information set forth below in contravention of sections 14(a) and 20(a) of the Exchange Act.

86. *The Sales Process Leading to the Proposed Acquisition.* The Background of the Merger section, which purports to describe the process leading up to the Proposed Acquisition, omits and/or misrepresents numerous material facts concerning this process. Specifically, the Proxy fails to disclose:

    (a) Whether other potential financial advisors were considered when the Board selected Morgan Stanley as its financial advisor, and the reasons behind this selection. This information is material because, given that Morgan Stanley previously served as one of the Company's book-running managers for the IPO, shareholders deserve to know if it was retained based solely on the basis of this prior working relationship, or on its expertise value in the field of mergers and acquisitions and its ability to maximize shareholder;

    (b) The specific criteria used by the Board to select Party D for contact by Morgan Stanley. The absence of this information creates a materially misleading picture as to whether the Board was selecting companies that could deliver the best value reasonably available to shareholders;

(c)     The specific process and timing issues, relating to Party B's offers, that the Board determined were unacceptable. This information is material because shareholders deserve to know the extent to which the Board was considering other factors in negotiating a deal to sell the Company besides maximizing shareholder value;

(d)     The specific terms of the "limited obligation to divest assets" contained in Party B's final offer. This information is material to shareholders because without it, they do not know the extent to which Party B – which was offering $0.50 per share more than Blackstone – was willing to compromise with the Company to get a deal done;

(e)     Why Blackstone contacted Thorpe regarding their potential interest in acquiring the Company, given the existing relationship between a senior managing director of Blackstone and Korngold. This omission raises questions as to personal interests that certain of the Individual Defendants may have had in agreeing to sell the Company to Blackstone.

87.     Without this material information, shareholders are left with an incomplete and misleading picture of the process employed by defendants in selling the Company. As such, shareholders are not being given the information they need to decide whether defendants took all steps necessary to maximize shareholder value and, in turn, whether the consideration being offered is sufficient to justify giving up their equity stake in Emdeon, a company with a bright and promising future.

88.     ***Morgan Stanley's Financial Analysis.*** Emdeon's Board retained Morgan Stanley to serve as the Company's financial advisor in connection with the Proposed Acquisition. On August 3, 2011, Morgan Stanley rendered its fairness opinion regarding the Proposed Acquisition, the full text of which is included and attached to the Proxy. Several key inputs and assumptions are missing from the financial analyses that underlie the fairness opinion. Specifically, the following financial analyses lack key inputs and assumptions and are therefore misleading:

(a)     ***Morgan Stanley's Selected Public Market Trading Multiples Analysis.*** In Morgan Stanley's Selected Public Market Trading Multiples Analysis, the Proxy fails to

disclose the basis for Morgan Stanley's application of selected multiples only to the street case projections as opposed to management's own projections.

(b) **_Morgan Stanley's Selected Precedent Transactions and Premiums Paid Analyses._** In Morgan Stanley's Selected Precedent Transactions and Premiums Paid Analyses, the Proxy fails to disclose the basis for Morgan Stanley's application of selected multiples only to the street case projections as opposed to management's own projections.

(c) **_Morgan Stanley's Illustrative Leveraged Buyout Analysis._** In Morgan Stanley's Illustrative Leveraged Buyout Analysis, the Proxy fails to disclose: (i) the basis for Morgan Stanley's use of the projections through 2015 in its Leveraged Buyout analysis when the projections extend to 2016; and (ii) the forecasted debt and cash balances as of December 31, 2015 used in this analysis.

(d) **_Morgan Stanley's Discounted Cash Flow Analysis._** In Morgan Stanley's Discounted Cash Flow Analysis, the Proxy fails to disclose: (i) the definition of unlevered free cash flow used in this analysis; (ii) the actual unlevered free cash flows used in the analysis; (iii) whether the value of the Company's Net Operating Losses was considered in the analysis; and (iv) why Morgan Stanley only used the projections through 2015 in its Discounted Cash Flow Analysis when the projections extended to 2016.

89. Without these key inputs and assumptions, the descriptions of these analyses are materially misleading because shareholders are unable to understand how the various analyses were performed and whether they were performed correctly. Emdeon shareholders therefore cannot assess whether the analyses are adequate measures by which to evaluate the Proposed Acquisition before deciding how to vote. In turn, this information is relevant for purposes of allowing shareholders to determine what weight, if any, to place on Morgan Stanley's fairness opinion.

90. **_The Services Rendered by Morgan Stanley._** The Proxy fails to disclose: (i) the specific financial advisory or financing services Morgan Stanley has provided to the Company, Blackstone, General Atlantic, and Hellman & Friedman, or any of their affiliates, in the last two years; (ii) how much compensation was earned by Morgan Stanley for services provided to the

Company in the two years prior to delivery of its fairness opinion; and (iii) the specific "certain other financial services" that were provided by Morgan Stanley to Blackstone, or its affiliates. This information is material because, given the central role played by Morgan Stanley in the evaluation, exploration, selection, and implementation of the Company's strategic alternatives and the rendering of the opinion that the Proposed Acquisition is fair, shareholders deserve to have disclosed investment banker compensation and potential conflicts.

91. ***UBS' Discounted Cash Flow Analysis.*** Emdeon's Board also retained UBS to serve as the Company's financial advisor in connection with the Proposed Acquisition. On August 3, 2011, UBS rendered its fairness opinion regarding the Proposed Acquisition, the full text of which is included and attached to the Proxy. Certain key inputs and assumptions are missing from UBS' Discounted Cash Flow Analysis. Specifically, the Proxy fails to disclose the specific terminal cash flow metrics used in the calculation of the implied perpetuity growth rates. Because the Discounted Cash Flow Analysis is very sensitive to inputs, this information is material to shareholders' understanding of how the analysis was performed. Indeed, without this information, the description of the Discounted Cash Flow Analysis is materially misleading because shareholders are unable to independently understand how the analysis was performed and whether it was performed correctly, and thereby assess whether it is an adequate measure by which to evaluate the Proposed Acquisition before deciding how to vote. In turn, this information is relevant for purposes of allowing shareholders to determine what weight, if any, to place on UBS' fairness opinion.

92. ***The Services Rendered by UBS.*** The Proxy fails to disclose: (i) the specific services that UBS has provided to Blackstone, General Atlantic, and Hellman & Friedman, or any of their affiliates, in the last two years; (ii) the specific credit facilities, and the respective amounts, that UBS has been/or currently is a participant in, with regard to Blackstone, General Atlantic, and Hellman & Friedman; (iii) the specific financial advisory or financing services that UBS provided to Blackstone, General Atlantic, and Hellman & Friedman, or any of their respective majority-owned affiliates and their respective majority-owned portfolio companies, since January 1, 2009; (iv) how much compensation was earned by UBS for services provided to

the Company in the two years prior to delivery of its fairness opinion; and (v) the specific investment funds, and the associated investment amounts, in which UBS is a participant with Blackstone. This information is material because, given the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, shareholders deserve to have disclosed investment banker compensation and potential conflicts.

93. Defendants were aware of their duty to disclose the foregoing material information in the Proxy, and acted with at least negligence in failing to ensure that this material information was disclosed. Absent disclosure of this material information, shareholders are unable to make an informed decision about whether to vote in favor of the Proposed Acquisition, and are thus threatened with irreparable harm warranting injunctive relief. Emdeon shareholders will continue to suffer irreparable harm absent judicial intervention.

## SELF-DEALING

94. By reason of their positions and affiliations with Emdeon, the Individual Defendants, General Atlantic, and Hellman & Friedman have access to non-public information concerning the financial condition and prospects of the Company. Thus, there exists an imbalance and disparity of knowledge and economic power between these and the public shareholders of Emdeon. Therefore, it is inherently unfair for the Individual Defendants, General Atlantic, and Hellman & Friedman to execute and pursue any proposed acquisition agreement under which they will reap disproportionate benefits to the exclusion of obtaining the best value for shareholders. Instead, the Individual Defendants, General Atlantic, and Hellman & Friedman disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Acquisition to meet their own personal needs and objectives.

95. Specifically, the Company's senior management is expected to continue in its prestigious and lucrative positions at Emdeon following completion of the Proposed Acquisition. As disclosed in Emdeon's August 4, 2011 Proxy Soliciting Material:

> The senior management team is delighted to be working with Blackstone and continue our relationship with H&F, who both have a deep understanding of our business and industry. At this time, we expect the current management team to continue in their leadership roles.

Given the longstanding relationship between Emdeon's management and Blackstone, this sort of preferential treatment seems unsurprising. Indeed, according to an article in The Wall Street Journal, citing a person familiar with the matter:

> **Blackstone, a well-versed health care investor, has known Emdeon's offerings and management team for years** as several Blackstone portfolio companies are Emdeon's customers, the person said. The company is well positioned to benefit from the demand for products that enhance efficiency of payment cycles, he said.

96.     Further, defendant Lazenby will also be entitled to over $5.1 million in "single-trigger" golden parachute payments payable in cash upon consummation of the Proposed Acquisition. As detailed in the Proxy, Lazenby will receive this massive cash windfall in respect of his unvested options, unvested restricted stock units, and shares of Emdeon Class A common stock issuable upon the exchange of previously unvested EBS Units. The $5.1 million amount also includes estimated future payments under Lazenby's Management Tax Receivable Agreement, which is described in the Proxy as follows:

> The Company also entered into a tax receivable agreement with the Management Members (the "Management Tax Receivable Agreement," and together with the Investors Tax Receivable Agreements, the "Tax Receivable Agreements"), which generally provides for the payment by the Company to the Management Members of 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax or franchise tax that the Company actually realizes in periods after the Company IPO as a result of (i) any step-up in tax basis in EBS Master's assets resulting from (A) purchases by the Company and its subsidiaries of EBS Units from the Management Members using a portion of the proceeds from the Company IPO, (B) exchanges by the Management Members of EBS Units (along with the corresponding shares of Emdeon Class B common stock) for cash or shares of Emdeon Class A common stock or (C) payments under this tax receivable agreement to the Management Members and (ii) tax benefits related to imputed interest deemed to be paid by the Company as a result of this tax receivable agreement.

97.     Hellman & Friedman and General Atlantic will also benefit from the Proposed Acquisition in ways not shared with Emdeon's other common shareholders. General Atlantic, which will see a "strong return" on its investment through the Proposed Acquisition, is in line to receive up to $2.75 million in payments in respect of its own Tax Receivable Agreement.

Hellman & Friedman also possesses a Tax Receivable Agreement which should grant it similar benefits.

98.     In addition, and unlike the Company's other common shareholders, Hellman & Friedman will be permitted to roll over a portion of its equity interest in Emdeon and retain ownership in the Company following completion of the Proposed Acquisition. Specifically, Hellman & Friedman has committed to roll over $330 million of equity into the go-forward company, and will also retain a board seat, according to a person familiar with the matter cited by *The Wall Street Journal*. This transaction will enable Hellman & Friedman to continue to benefit from Emdeon's bright future prospects, while members of the Class will be forced to accept the unfair Proposed Acquisition.

99.     Numerous members of the Board are also managing members of General Atlantic or Hellman & Friedman and thus stand to gain personally from those firms' benefits in the Proposed Acquisition through their stakes in the respective firms. Defendants Hammarskjold and Thorpe are Managing Directors of Hellman & Friedman, and Hammarskjold is also CEO of the firm. Defendants Dzialga and Korngold are Managing Directors of General Atlantic.

100.    The Proposed Acquisition is wrongful, unfair, and harmful to Emdeon's public stockholders, and represents an effort by the Individual Defendants, General Atlantic, and Hellman & Friedman to aggrandize their own financial position and interests at the expense of and to the detriment of the Class members. Specifically, defendants are attempting to deny plaintiff and the Class their shareholder rights through the sale of Emdeon via an unfair process. Accordingly, the Proposed Acquisition will benefit the Individual Defendants, General Atlantic, and Hellman & Friedman at the expense of other Emdeon shareholders.

## THE UNFAIR AND INADEQUATE PROCESS

101.    In order to meet their fiduciary duties, the Individual Defendants are obligated to explore transactions that will maximize shareholder value, and not structure a preferential deal for themselves. Due to the Individual Defendants' eagerness to enter into a transaction with Blackstone, they failed to implement a process to obtain the maximum price for Emdeon shareholders.

102. As a result of defendants' conduct, Emdeon public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company. The Proposed Consideration does not reflect the true inherent value of the Company that was known only to the Individual Defendants, as officers and directors of Emdeon, and Blackstone at the time the Proposed Acquisition was announced.

103. In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

- Withdraw their consent to the merger of Emdeon with Blackstone and allow the shares to trade freely - without impediments such as the no-solicitation clause, matching rights, termination fee, and Voting Agreements;

- Act independently so that the interests of Emdeon's public stockholders will be protected;

- Adequately ensure that no conflicts of interest exist between defendants' own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Emdeon's public stockholders; and

- Solicit competing bids to Blackstone's offer to assure that the Company's shareholders are receiving the best reasonably obtainable value for their shares.

104. The Individual Defendants have also approved the Proposed Acquisition so that it transfers 100% of Emdeon's unique assets, revenues, and profits to Blackstone and Hellman & Friedman through its substantial minority equity interest, thus all of Emdeon's operations will now accrue to the benefit of the Blackstone and Hellman & Friedman.

## CLASS ACTION ALLEGATIONS

105. Plaintiff brings this action for himself and on behalf of all holders of Emdeon common stock which have been or will be harmed by the conduct described herein (the "Class"). Excluded from the Class are the defendants and any individual or entity affiliated with any defendant.

106. This action is properly maintainable as a class action.

107. The Class is so numerous that joinder of all members is impracticable. According to the Company's SEC filings, there were more than 91 million shares of Emdeon common stock outstanding as of August 2, 2011.

108.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, inter alia, the following:

(a)    whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(b)    whether the Individual Defendants are engaging in self-dealing in connection with the Proposed Acquisition;

(c)    whether the Individual Defendants have breached any of their other fiduciary duties owed to plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, and fair dealing;

(d)    whether Emdeon aided and abetted the Individual Defendants' breaches of fiduciary duties;

(e)    whether Blackstone, General Atlantic, Hellman & Friedman, Beagle, and/or Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duties; and

(f)    whether plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

109.    Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

110.    Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

111.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

112.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

113.    Defendants have acted on grounds generally applicable to the Class with respect

to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Claim for Breaches of Fiduciary Duties Against the Individual Defendants

114. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115. The Individual Defendants have violated their fiduciary duties of care, loyalty, candor, good faith, and independence owed to the public shareholders of Emdeon and have acted to put their personal interests ahead of the interests of Emdeon's shareholders.

116. By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiff and other members of the Class of the true value inherent in and arising from Emdeon.

117. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, candor, good faith, and independence owed to the shareholders of Emdeon because, among other reasons:

      (a)    they failed to take steps to maximize the value of Emdeon to its public shareholders;

      (b)    they failed to properly value Emdeon and its various assets and operations; and

      (c)    they ignored or did not protect against the numerous conflicts of interest resulting from the officers' and directors' own interrelationships or connections with the Proposed Acquisition.

118. Because the Individual Defendants dominate and control the business and corporate affairs of Emdeon, and have access to private, corporate information concerning Emdeon's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Emdeon which

makes it inherently unfair for them to pursue and recommend any proposed acquisition wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

119. By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

120. Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to plaintiff and the Class, and may consummate the Proposed Acquisition which will exclude the Class from its fair share of Emdeon's valuable assets and operations, and/or benefit defendants in the unfair manner complained of herein, all to the irreparable harm of the Class.

121. The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

122. As a result of the Individual Defendants' unlawful actions, plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Emdeon's assets and operations. Unless the Proposed Acquisition is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition terms, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

123. Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT II

### Claim for Aiding and Abetting Breaches of Fiduciary Duties Against Emdeon

124. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125. Emdeon aided and abetted the Individual Defendants in breaching their fiduciary duties owed to the public shareholders of the Company, including plaintiff and the members of the Class.

126. The Individual Defendants owed to plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

127. By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to plaintiff and the members of the Class.

128. Emdeon colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and was an active and knowing participant in the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the members of the Class.

129. Emdeon participated in the breaches of the fiduciary duties by the Individual Defendants for the purpose of advancing its own interests. Emdeon obtained and will obtain both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendants' breaches. Emdeon will benefit, from the acquisition of the Company's newly issued shares at an inadequate and unfair price if the Proposed Acquisition is consummated.

130. Plaintiff and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

## COUNT III

### Claim for Aiding and Abetting Breaches of Fiduciary Duties Against Blackstone, General Atlantic, Hellman & Friedman, Beagle, and Merger Sub

131. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132. Blackstone, General Atlantic, Hellman & Friedman, Beagle, and Merger Sub aided and abetted the Individual Defendants in breaching their fiduciary duties owed to the public shareholders of the Company, including plaintiff and the members of the Class.

133. The Individual Defendants owed to plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

134. By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to plaintiff and the members of the Class.

135. Blackstone, General Atlantic, Hellman & Friedman, Beagle, and Merger Sub colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and were active and knowing participants in the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the members of the Class.

136. Blackstone, General Atlantic, Hellman & Friedman, Beagle, and Merger Sub participated in the breaches of the fiduciary duties by the Individual Defendants for the purpose of advancing their own interests. Blackstone, General Atlantic, Hellman & Friedman, Beagle, and Merger Sub obtained and will obtain both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendants' breaches. Blackstone, General Atlantic, Hellman & Friedman, Beagle, and Merger Sub will benefit, from the acquisition of the Company's newly issued shares at an inadequate and unfair price if the Proposed Acquisition is consummated.

137. Plaintiff and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in his favor and in favor of the Class and against defendants as follows:

A. Declaring that this action is properly maintainable as a class action;

B. Declaring and decreeing that the Proposed Acquisition represents breaches of the fiduciary duties of defendants and is therefore unlawful and unenforceable;

C. Rescinding, to the extent already implemented, the Agreement agreed to in connection with the Proposed Acquisition;

D. Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process reasonably designed to enter into an investment agreement providing the best possible value for shareholders;

E.    Directing the Individual Defendants to exercise their fiduciary duties to commence a bidding process that is reasonably designed to secure the best possible consideration for Emdeon's issued shares and obtain a transaction which is in the best interests of Emdeon's shareholders;

F.    Imposition of a constructive trust in favor of plaintiff and members of the Class, upon any benefits improperly received by defendants as a result of their wrongful conduct;

G.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

DATED: September 6, 2011

BARRETT JOHNSTON, LLC
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY MILES

TIMOTHY L. MILES

217 Second Avenue North
Nashville, TA 37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
tmiles@barrettjohnston.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
brobbins@robbinsumeda.com
ARSHAN AMIRI
aamiri@robbinsumeda.com
LAUREN E. ROSNER
lrosner@robbinsumeda.com
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

THE BRISCOE LAW FIRM, PLLC
WILLIE BRISCOE
wbriscoe@thebriscoelawfirm.com
8117 Preston Road, Suite 300
Dallas, TX 75225
Telephone: (214) 706-9314
Facsimile: (214) 706-9315

POWERS TAYLOR LLP
PATRICK POWERS
Patrick@powerstaylor.com
8150 N. Central Expressway, Suite 1575
Dallas, TX 75206
Telephone: (214) 239-4565
Facsimile: (214) 550-2635

Attorneys for Plaintiff

644949